[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 19-10964
_____

D.C. Docket No. 3:16-cv-01421-HLA-PDB

DANNY CRAWFORD,
BETTY ANN CRAWFORD,

Plaintiffs-Appellees,

versus

ITW FOOD EQUIPMENT GROUP, LLC,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(October 21, 2020)

Before JORDAN, TJOFLAT, and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

Danny Crawford sued ITW Food Equipment Group LLC ("FEG") for negligent product design after his arm was amputated when it came into contact with the unguarded blade of one of FEG's commercial meat saws, the Hobart Model 6614. After a jury trial, Crawford and his wife were awarded $4,050,000. FEG now appeals this verdict on evidentiary and sufficiency of the evidence grounds. We conclude that the district court's evidentiary determinations were within its discretion, and that FEG's other challenges lack merit. Accordingly, we affirm.

## I.    BACKGROUND

Danny Crawford was the meat-market manager at a supermarket in Jacksonville. One Sunday in 2015, Crawford was cutting meat with the Hobart 6614 vertical band saw, manufactured by FEG, when he was called away to fill one of the store's meat cases and speak with associates. Crawford, admittedly distracted, forgot to deploy the meat saw's blade guard. When he returned to the meat saw, he reached for his box cutter. His arm contacted the unsheathed blade and was amputated.

Crawford and his wife Betty Ann Crawford brought a products liability action against FEG, raising both strict liability and negligence design defect claims. The district court held a four-day jury trial. Late during trial, Crawford withdrew his strict liability claim.

2

Crawford's theory of the case was that FEG negligently designed the Hobart 6614's blade guard. The meat saw used an adjustable guard, meaning that the operator of the saw must manually raise and lower the guard for it to block the blade from coming into contact with meat or the operator's body. Crawford presented the testimony of Professor Ralph Barnett, a professor of mechanical and aerospace engineering and an expert in saw and guard design. Professor Barnett testified that FEG failed to use reasonable care in designing the Hobart 6614 due to its use of an adjustable blade guard. Based on his experience, he testified, this failure to use reasonable care was a contributing cause of Crawford's amputation; had the Hobart 6614 been designed with a self-deploying blade guard, Crawford's injury would not have occurred.

To that end, Professor Barnett designed and built an alternative meat saw, closely modeled on the Hobart 6614, that employed a self-deploying blade guard. His design used a foot pedal connected to air compressors to lower the guard when the pedal was depressed and raise the guard when released, so that when the saw's operator walks away, the guard automatically deploys.

In addition to Professor Barnett's testimony, Crawford presented the testimony of Dr. Mark Edwards, a human factors engineer who discussed the inverse relationship between job performance and workload, as well as how workers can fail to see objects that are not the focus of their attention (which he

3

characterized as "inattentional blindness").  He stated that a self-deploying guard can protect against what he characterized as the inevitability of human error.  Crawford presented evidence that dovetailed with Edwards's analysis: the amputation occurred on a Sunday, the busiest day in the store's meat department, and Crawford was manager of that department and thus had other duties to which to attend.  The meat department was noisy and employees came in and out of the area.  Crawford testified that he was unable to see that the blade was active and unguarded and did not notice the vibration.  And testimony was presented that the blade and its guard were similar colors.

FEG moved to exclude Professor Barnett's alternative design on the grounds that it did not meet the Daubert standard for expert testimony, and moved for summary judgment.  FEG's summary judgment motion noted that Professor Barnett, in his report and deposition, could not identify any self-deploying guard available when the Hobart 6614 was manufactured in 2010;[1] in response, Crawford submitted an affidavit from Professor Barnett stating that since his report and deposition, he had identified three meat saws using a self-deploying blade guard

---

[1]    Professor Barnett's written report had identified an Australian meat saw that did utilize the automatic blade guard technology, but FEG pointed out that the Australian saw was not produced until after the 2010 manufacturing of the Hobart 6614 saw, and was thus not a relevant comparator product.

4

that had been patented in 1976,[2] as well as an additional patent that had not been used on any manufactured designs.

Crawford also introduced summaries of incidents reported to the Occupational Safety and Health Administration (OSHA) in which saw operators had been injured by meat saws with adjustable blade guards while not cutting meat. Some of these incidents involved the Hobart 6614's predecessor saw, the model 6801, which had the same adjustable guard as the model 6614. Professor Barnett noted that OSHA recommended self-adjusting guards to the industry in 2007. D.E. 71 at 84.

FEG's requested jury instructions had included Florida's "state-of-the-art defense," which provides that "the finder of fact shall consider the state of the art of scientific and technical knowledge and other circumstances that existed at the time of manufacture, not at the time of loss or injury." Fla. Stat. § 768.1257. The district court concluded that this defense only applied to strict liability and not negligence actions and, because Crawford had voluntarily dismissed his strict liability claim, declined to give the instruction.

The jury found that Crawford and FEG's negligent design were both responsible for Crawford's injury. It found Crawford 70% at fault and FEG 30%

---

[2]    The Bizerba FK 23, the Omega One, and the Mado Perfekta.

at fault.  The jury found Crawford's total damages were $13,500,000, of which just over $4 million was allocated to FEG under the jury's comparative fault finding.

At the close of Crawford's case and again after trial, FEG moved for judgment as a matter of law.  FEG argued that Crawford failed to prove that its meat saw was defective and that Crawford's expert testimony was inadmissible.  The district court denied these motions, concluding that Crawford had presented sufficient evidence to support the jury's verdict, and that Crawford's experts satisfied the Daubert standard.

FEG also moved for a new trial.  FEG argued that the district court should have issued the state-of-the-art defense instruction, and that this instruction would have altered the jury's verdict.  FEG also argued that the district court should have excluded the OSHA reports and Crawford's expert testimony.

The district court denied the motion for a new trial.  It concluded that its failure to give the state-of-the-art instruction did not result in prejudicial harm to FEG.  It also concluded that its admission of the OSHA reports complied with the public records hearsay exception and that the reports were relevant to Crawford's case.

FEG timely appealed.

## II.    PROFESSOR BARNETT'S EXPERT TESTIMONY

### A. Barnett's Report

6

FEG first argues that the district court should not have admitted Professor Barnett's testimony. Federal Rule of Evidence 702 establishes the district court as the gatekeeper to the admission of scientific or technical expert testimony. The court must determine that the expert is qualified regarding the matter at hand, employs a reliable methodology, and will provide testimony that assists the trier of fact to understand the issue. Fed. R. Evid. 702. In Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 113 S. Ct. 2786 (1993), the Supreme Court set forth the standard for analyzing whether an expert's methodology is reliable. Reliability is determined by considering: "(1) whether the expert's testimony can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1341 (11th Cir. 2003) (citing Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150, 119 S. Ct. 1167, 1175 (1999)). Both Daubert and Kumho emphasize that the test is "a flexible one" that must be "tied to the facts." 509 U.S. at 594; 526 U.S. at 150; see also id. at 141-42 ("But, as the Court stated in Daubert, the test of reliability is 'flexible,' and Daubert's list of factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants the district court the same

7

broad latitude when it decides how to determine reliability as it enjoys in respect of its ultimate reliability determination.").

The district court's decision to admit Barnett's testimony is reviewed pursuant to an abuse of discretion standard. McClain v. Metabolife Int'l, Inc., 401 F.3d 1233, 1238 (11th Cir. 2005). This court can only reverse the district court if it applied an incorrect legal standard, followed improper procedures, or made clearly erroneous findings of fact. Chicago Trib. Co. v. Bridgestone/Firestone, Inc., 263 F.3d 1304, 1309 (11th Cir. 2001); see also McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1257 (11th Cir. 2002) (noting that "our review of evidentiary rulings by trial courts on the admission of expert testimony is very limited" (internal quotations omitted)); Michigan Millers Mut. Ins. Corp. v. Benfield, 140 F.3d 915, 921 (11th Cir. 1998) ("It is very much a matter of discretion with the trial court whether to permit the introduction of evidence, and we will not reverse the decision of the trial court regarding the exclusion or admission of such evidence unless the trial court's decision is manifestly erroneous." (internal quotations omitted)).

Barnett's ultimate conclusion was that FEG did not use reasonable care in designing the Hobart 6614 meat saw. His theory was that the Hobart 6614 is unreasonably dangerous because it lacks an auto-deploying blade guard. He crafted an alternative design using an auto-deploying guard deployed with a foot

8

pedal; the blade guard would raise when the pedal was pressed and lower when the pedal was released. When the guard was lowered, it would shield the user from the blade. Barnett explained both his alternative saw and other saws with self-deploying guards to the jury.

FEG argues that Barnett's testimony fails the Daubert standard. A "key question" when evaluating an expert's proposed alternative design, says FEG, is "testability;" this ensures that the jury focuses on the relevant question of whether the manufacturer could have designed a better product. See Hilaire v. DeWalt Indus. Tool. Co., 54 F. Supp. 3d 223, 248 (E.D.N.Y. 2014). FEG argues that Barnett did not test whether his proposed design would function similarly to the Hobart 6614 meat saw, or whether his design would be purchased by users. Because Barnett did not demonstrate that his alternative design was both "economically feasible and just as safe or safer" as the Hobart 6614, see id. at 247, FEG argues that his testimony is unreliable.

Crawford argues that Barnett's testimony regarding his alternative design was reliable. It was subject to "thorough testing." Barnett applied for a patent. Barnett demonstrated his guard through a video to the jury, which showed that it can effectively cut meat and can be disassembled for cleaning. In addition, Barnett testified about other saws that use self-deploying guards, demonstrating general

acceptance of the principles behind Barnett's design, as well as showing a lower "error rate."

In addition, Crawford argues that FEG's contentions regarding whether or not users would purchase Barnett's proposed design go to the weight of Barnett's testimony, and not to its reliability. Whether the benefits of his proposed blade guard would outweigh its costs and risks, Crawford says, is a typical jury question. Thus, FEG's testimony regarding the alternative design's increased costs, new hazards, or decreased usefulness was all properly weighed by the jury.

Ultimately, it seems to us that most of the issues FEG raises with Barnett's testimony are objections going to the weight of his testimony regarding his alternative design, and not objections to its admissibility. See Quiet Tech. DC-8, 326 F.3d at 1345 (identifying methodological flaws that "impugn the accuracy of . . . results" without questioning the "general scientific validity of . . . methods" is "precisely the role of cross-examination" and "go[es] to the weight, not the admissibility, of the evidence"); see also Daubert, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

For example, FEG argues that Barnett's auto-deploying blade guard could be "easily bypassed" by locking the guard in place. This goes to the weight of the

10

evidence—that is, whether the proposed design actually makes the user safer. The same applies to "the additional cost," the "introduction of an air compressor," and "the new tripping hazards," all of which are factors that FEG raised vigorously on cross-examination and were placed in front of the jury. See Quiet Tech. DC-8, 326 F.3d at 1345 ("The identification of such flaws in generally reliable scientific evidence is precisely the role of cross-examination."). Arguments that an alternative design costs too much, or does not increase safety as much as it claims to, are arguments that go to the weight of the expert's testimony, and not its admissibility.

FEG does not question Barnett's qualifications. Indeed, the evidence suggests that he is among the foremost experts in the country on saw guards. Of the four factors guiding the reliability inquiry, FEG's main objection to Barnett's testimony is that he failed to sufficiently test his alternative design. But FEG is, for the most part, silent on just what Barnett should have done differently. FEG does mention that it would have liked Barnett to survey purchasers of commercial meat saws to see whether they would have purchased his design. But FEG does not cite any case law indicating that consumer surveys or commercial analysis of a product is required before its design can be admitted.

A frequently used and effective methodology in proving the availability of an alternate design that is safer than the challenged design involves building an

11

alternate design or creating a mathematical or computer model. See, e.g., Quilez-Velar v. Ox Bodies, Inc., 823 F.3d 712, 718-20 (1st Cir. 2016). FEG relies on just this kind of testing, or the lack thereof, when it cites McGee v. Evenflo Co., No. 5:02-CV-259-4(CAR), 2003 WL 23350439 (M.D. Ga. Dec. 11, 2003). Such testing would either physically reconstruct an accident and empirically determine which design was safer or would use a mathematical model to adduce the same information.

In the circumstances of this case, we conclude that Barnett adequately tested his alternate design. Indeed, by constructing an alternate design he employed a standard method of testing. Barnett's model saw in effect modified the Hobart 6614 saw itself by adding an automatic blade guard, operated by a foot pedal. When the operator depresses the pedal to begin sawing meat, the blade guard is lifted; when the operator releases his foot from the pedal, the blade guard automatically returns to its safe position. Barnett tested the model, applied for a patent, and submitted it for peer review in the American Journal of Mechanical Engineering. The jury even saw a video of Barnett demonstrating the operation of his model.

Thus, the jury saw the efficacy and safety of the alternative model. The demonstration showed how the model would prevent the injury in this case. We note that the evidence in this case showed that Crawford's injury was typical of

12

injuries that inevitably would occur because of human error when a blade guard that is not automatically deployed leaves the blade unguarded when the operator in a busy meat department is interrupted by intervening duties and distracted.[3]  The jury could see in the operation of Barnett's model that when the operator is thus distracted and leaves his post at the saw, the foot pedal is released and the blade guard automatically deploys.

The jury could also see that the Barnett model simply adapts FEG's own Hobart 6614 saw, and that the efficiency and utility of the Barnett model would be comparable to that of the 6614 saw.  In other words, the demonstration of the Barnett model showed that FEG's own saw could have been readily altered to include an automatic blade guard, thus undermining FEG's argument that the other saws with automatic blade guards existing at the relevant time of manufacture were not the Hobart 6614's competitors because they were smaller and unable to handle the volume of meat cutting.  And Barnett testified that the cost of materials he used in modifying the Hobart 6614 was a mere $264.  Thus, Barnett's testing and demonstration before the jury was probative evidence that his alternative design was feasible with respect to utility (e.g., volume of meat that could be cut) and economically or commercially feasible as well.

---

[3]     The jury found that Crawford's negligence was 70% responsible in this case.

For the foregoing reasons, we readily conclude that the district court did not abuse its broad discretion in rejecting FEG's challenge to Barnett's testimony based on inadequate testing.  As noted above, FEG does not challenge Barnett's exemplary qualifications.  Other than with respect to testing, FEG does not otherwise seriously challenge the reliability of Barnett's expert testimony.  We need note only that there has been peer review and, with respect to the factor of general acceptance in the scientific community, we note that in 2007 (before the 2010 manufacture of the Hobart 6614), OSHA recommended that the industry install self-adjusting blade guards.  Moreover, Professor Barnett testified that the industry has long known that blade guards increase safety.  Thus, we reject FEG's Daubert challenge to the admissibility of Barnett's testimony.

B. Barnett's Supplemental Affidavit

FEG proposes a second reason that part of Barnett's testimony should have been excluded: part of it, introduced in a supplemental affidavit discussing meat saws designed by other companies, was untimely disclosed.  Fed. R. Civ. P. 26(a) requires expert reports to contain all opinions the witness will express.  Supplementation is permitted under Rule 26(e) to correct inaccuracies or add information not available when the report was filed.  Rule 37(c)(1) bars use of information not provided under 26(a) or (e) unless the failure was substantially justified or harmless.  We review a district court's Rule 37(c)(1) decision for abuse

14

of discretion.  See Guevara v. NCL (Bahamas) Ltd., 920 F.3d 710, 717-18 (11th Cir. 2019).

FEG argues that the supplemental affidavit was untimely, and, with respect to the justification excuse, it argues that Crawford had no justification for submitting the new affidavit after the expert report deadline because it was not based on new information, but was based on continued research.  With respect to the harmless excuse, FEG argues that the supplemental affidavit was submitted after Barnett was deposed, and that FEG "could not adequately probe [the matter] before trial."  FEG brief at 26.  Crawford, on the other hand, argues that Barnett's affidavit did not violate Rule 26, and, alternatively, that the district court was correct to find that the admission of the new Barnett affidavit was either substantially justified or harmless.

We need not decide whether there was a violation of Rule 26, because we do not think that the district court's admission of Barnett's supplemental affidavit can be considered an abuse of discretion.  Our decision that the district court did not abuse its discretion is a narrow one, responding only to FEG's sparse challenge to the district court's ruling on appeal, and based on the particular facts of this case.  Our narrow holding is that the district court did not abuse its discretion in finding that allowing the jury to consider Barnett's supplemental affidavit was harmless.  FEG's sparse challenge on appeal is that Barnett's affidavit was submitted after his

15

deposition was taken.   But FEG's challenge on appeal is to the failure of the district court to grant judgment as a matter of law at trial. And the affidavit was submitted five months before trial.  FEG could have asked the district court for a supplemental deposition but did not.  Instead, with ample time to prepare, FEG chose to examine Barnett on these alternative designs at trial.  Moreover, it was clear that the automatic blade guard technology had long been known in the industry, and was available at the relevant time of the Hobart 6614's manufacturing in 2010.  Significantly, OSHA had recommended to the industry in 2007 that it should install self-adjusting blade guards.  In light of FEG's sparse challenge on appeal and the absence of evidence that FEG was prejudiced by surprise or impairment of ability to prepare, FEG has failed to persuade us that the district court abused its discretion.[4]

## III.    SUFFICIENCY OF THE EVIDENCE OF NEGLIGENT DESIGN

---

[4]    We note again the narrowness of our holding.  For example, we express no opinion on an issue that has split the circuits – i.e., whether or not, even in the absence of substantial justification or harmlessness, the fact of an untimely disclosure under Rule 26 automatically requires exclusion of the evidence rather than one of the "other appropriate sanctions" suggested in Rule 37(c)(1)(C). See Taylor v. Mentor Worldwide, LLC, 940 F.3d 582, 603 (11th Cir. 2019) (Judge J. Carnes concurring).  Moreover, our opinion adds little to the meaning or scope of the term "harmless," holding, as we do, only that FEG's sparse challenge on appeal has failed to persuade us that the district court abused its discretion under the particular circumstances of this case.  We do not address the issues discussed in Part I of Judge Tjoflat's opinion because we do not believe they were fairly raised in FEG's brief on appeal.  We also note that Judge Tjoflat himself does not believe that the district court's exclusion of Professor Barnett's supplemental affidavit constitutes reversible error.

16

FEG argues that the district court misapplied Florida's negligent design law, and that under the proper test, there is not sufficient evidence to demonstrate negligent design. The standard of review for sufficiency of the evidence is de novo, but the jury's verdict is entitled to deference: all evidence and inferences must be in the light most favorable to the prevailing party, and the Court must ask whether there was any legally sufficient basis for the verdict, remembering that credibility determinations, evidentiary weighing and inference drawing are jury functions. See Pensacola Motor Sales, Inc. v. Eastern Shore Toyota, LLC, 684 F.3d 1211, 1226 (11th Cir. 2012).

FEG argues that the district court discussed Crawford's burden of proof in highly general terms; it instructed the jury that Crawford needed to demonstrate that FEG's model 6614 meat saw was not designed with "reasonable care" and was not "reasonably safe for use in a foreseeable manner." The district court should not have used this general negligence language, FEG says; rather, it should have employed either the "risk utility" test, cited with approval by the Florida Supreme court in Aubin v. Union Carbide Corp., 177 So.3d 489, 505 (Fla. 2015), or the "consumer expectations" test, also mentioned in Aubin. The risk utility test balances six factors to determine whether a product's risk outweighs its utility to the consumer; if it does, it is negligently designed. The six factors are: (1) likelihood/gravity of potential injury balanced against its utility, (2) availability of

17

other safe products to meet the same need, (3) obviousness of the danger, (4) public knowledge/expectation of the danger, (5) adequacy of instructions and warnings, and (6) the ability to eliminate/minimize the danger without impairing the product or making it too expensive. Radiation Tech., Inc. v. Ware Constr. Co., 445 So.2d 329, 331 (Fla. 1983). The consumer expectations test, meanwhile, focuses on whether the product was more dangerous than the ordinary consumer would reasonably anticipate. Aubin, 177 So.3d at 503.

Crawford contends that Florida courts do not actually apply either of these tests in negligent design cases, only in strict liability cases. Negligent design cases are instead governed solely by whether a defendant breached its duty of reasonable care. Jennings v. BIC Corp., 181 F.3d 1250, 1256-57 (11th Cir. 1999).

We will assume arguendo—but we expressly do not decide—that either the risk utility test or the consumer expectations test must be satisfied to demonstrate negligent design, although this is far from clear.[5] FEG did not preserve an objection to the failure to give jury instructions on the risk utility test and/or the consumer expectations test, and does not argue on appeal that the district erred by

---

[5]    Florida courts have noted that the definition of a "design defect" is in a "state of flux in Florida," In re Standard Jury Instructions in Civil Cases – Report No. 09-10 (Prods. Liab.), 91 So.3d 785, 789 (Fla. 2012) (Pariente, J., concurring), and that "in 'the byzantine world of products liability' it is unsettled whether the consumer-expectation test, risk-utility test or both should be applied in evaluating an alleged defect," Dugas v. 3M Co., No. 3:14-cv-1096-J-39BT, 2016 WL 1271040, at *7 (M.D. Fla. March 29, 2016) (quoting Force v. Ford Motor Co., 879 So.3d 103, 106-07 (Fla. 5th DCA 2004)).

failing to give such instructions.  Rather, FEG argues on appeal only that there is insufficient evidence to satisfy either test and therefore plaintiffs' claim fails.

We conclude that there is sufficient evidence introduced at trial to satisfy Florida's risk utility test and is sufficient to uphold a verdict of negligent design. Considering the evidence in the light most favorable to Crawford, there was a "legally sufficient basis for a reasonable jury" to conclude that a defect existed with respect to the Hobart 6614.  See Pensacola Motor Sales, 684 F.3d at 1226. FEG lists six factors that, it argues, bear on whether a product's risk outweighs its utility.  We think that there is strong evidence as to three of the factors that could lead a reasonable jury to conclude that the model 6614 meat saw fails the risk utility test, and weaker evidence with respect to the other three factors.

First, as to the likelihood or gravity of potential injury as compared to a product's utility (factor one): A reasonable jury could conclude that a blade guard that does not automatically slide into place when the saw is not in use poses the likelihood of a grave injury—amputation—while not seriously enhancing the saw's utility.  Indeed, this is the entire crux of Professor Barnett's testimony.  The jury also heard testimony from Dr. Edwards, a human factors engineer, on how performance deteriorates when workload increases and people can—and will— make inevitable mistakes.

19

Second, as to the availability of other, safer products to meet the same need (factor two): This is supplied both by Professor Barnett's proposed alternative design and his introduction of other meat saws that use automatically deploying blade guards. D.E. 71 at 67, 82. Professor Barnett demonstrated his meat saw via video. D.E. 71 at 91-93. Professor Barnett also testified that automatic blade guard technology had long been known, and that the materials and concepts necessary to design and manufacture his alternative design were in existence when the saw was designed in the late 1990s and manufactured in 2010. See D.E. 71 at 67, 135. The jury heard testimony from FEG that meat saws with automatic blade guards will inevitably be smaller and thus cannot process a sufficient quantity of meat and "meet the same need" as the model 6614, but there is sufficient evidence in the record to conclude that the jury did not act unreasonably in finding otherwise.

Third, as to the manufacturer's ability to eliminate/minimize danger without seriously impairing the product/making it unduly expensive (factor six): FEG presented a significant amount of testimony arguing that Professor Barnett's alternative design was not economically or mechanically efficient. Two experts, Hyde and Bader, testified that Professor Barnett's design would be difficult to clean, D.E. 73 at 133-134, and would raise the potential for tripping. D.E. 73 at 34. However, Professor Barnett testified that his modified saw would cost only

20

$264 more to produce. D.E. 71 at 90, 135. And Professor Barnett provided persuasive testimony that his alternative model was not only economically feasible, but also could efficiently handle the necessary large volume of meat. His testimony also effectively rebutted the cleaning and tripping challenge. We cannot conclude that the jury was unreasonable in implicitly finding that the proposed cleanliness and tripping issues would not render Barnett's design "seriously impaired."

While there is strong evidence in this record with respect to factors one, two, and six that the risk of danger of the Hobart 6614 outweighs its utility, the evidence with respect to factors three, four, and five is closer to neutral. Factors three and four are the obviousness of the danger and the public knowledge or expectation of the danger. These factors are closely related. Crawford did testify that it would be "obvious" that he would be seriously injured if he left the blade guard up while the saw was running and not in use. But the key issue in this case is the utility and added safety of a blade guard designed to protect users from accidentally coming into contact with the saw when it was not in use. The core of Professor Barnett's testimony was that these inevitable, accidental injuries could be prevented at little cost to the manufacturer with an automatically deploying blade guard. So a jury could conclude that, while the danger from a moving meat saw is in one sense obvious, there will always be accidents caused by human mistakes.

21

Thus, factors three and four are closer to being neutral, but the jury could have reasonably found that they too suggest that the risks involved with the Hobart 6614 outweigh its utility.

The fifth factor is the adequacy of instructions or warnings: FEG did warn against leaving the blade guard up while the saw was not in use.  But a jury could reasonably conclude that some accidents will happen due to human nature, and that a warning or instruction manual will not be sufficient to prevent those.  Only an automatically deploying blade guard would prevent injury from such inevitable human mistakes.  Thus, a jury reasonably could find this factor neutral or providing some support for the risk of the Hobart 6614 outweighing its utility.

Balancing the factors, we conclude that the evidence introduced at trial was sufficient to support a finding that the Hobart 6614 fails the risk-utility test.

We also conclude that the evidence introduced at trial was sufficient to support a finding that FEG's saw failed the consumer expectations test.  The consumer expectations test "considers whether a product is unreasonably dangerous in design because it failed to perform as safely as an ordinary consumer would expect when used as intended or in a reasonably foreseeable manner."  Aubin, 177 So.3d at 503.  Again, the plaintiffs introduced significant evidence through both of their experts that there will inevitably be accidental injuries caused by the saw operator's inability to maintain one hundred percent focus one hundred

22

percent of the time.  But while these lapses are, in the long run, inescapable, they are by no means obvious to the typical user of meat saws.  It is thus not dispositive that FEG emphasizes Crawford's 40 years of meat saw experience and his testimony that the Hobart 6614 "worked exactly as I expected it to work."  The core danger demonstrated by the evidence at trial was not specifically the obvious danger presented by the blade of the meat saw, but more precisely the inability of a human operator in a busy and high-stress environment to protect himself with perfect accuracy from that blade.  The testimony of both of plaintiffs' experts provided evidence on the basis of which the jury could find that it was reasonably foreseeable that ordinary consumer use of the Hobart 6614 would inevitably result in injuries to the user.  The OSHA reports provided additional supporting evidence.  And Professor Barnett's testimony provided evidence from which the jury could find that an alternate design was readily available (and was feasible, both economically and otherwise) and would virtually eliminate such inevitable injuries.  Professor Barnett's testimony provided evidence from which the jury could find that FEG, at the time of the 2010 manufacture, could have readily modified its Hobart 6614 to provide such a safety measure.

Given this evidence, the ordinary consumer might well expect that a manufacturer would build into its machines a mechanism to protect the user from himself, as it were.  No saw operator likely thinks that he will ever come into

23

contact with an unsheathed blade.  But the testimony of Professor Barnett and Edwards provided evidence on the basis of which a jury could find that an ordinary consumer would expect a reasonable manufacturer to provide such a safety measure that was readily available, feasible both economically and otherwise, and the need for which was foreseeable.

The standard for this sufficiency challenge is whether "there was <u>any</u> legally sufficient basis for a reasonable jury" to conclude that the Hobart 6614 failed the consumer expectations test.  <u>Pensacola Motor Sales</u>, 684 F.3d at 1226 (emphasis added).  We conclude that the record provides sufficient evidence that an ordinary consumer would expect to be protected from their own inevitable lapses in attention.

Thus, we reject FEG's challenge to the sufficiency of the evidence.

## IV.    STATE-OF-THE-ART INSTRUCTION

FEG argues that it is entitled to a new trial because the district court did not instruct the jury on Florida's state-of-the-art defense.[6]  The court's decision not to grant a new trial is reviewed for abuse of discretion.  <u>Pensacola Motor Sales</u>, 684 F.3d at 1224.

---

[6]    Crawford argues that FEG waived this issue.  However, FEG expressly objected to the absence of this instruction at trial, arguing that the jury should be told that it should focus on whether FEG was negligent in 2010, at the time of manufacture, and not in 2018, the date of the trial.  D.E. 74 at 65.  Accordingly, we hold that FEG has preserved its objection to the extent of its argument that the jury be told that the 2010 date of manufacture was the relevant time.

24

Florida law provides that "[i]n an action based upon defective design, brought against the manufacturer of a product, the finder of fact shall consider the state of the art of scientific and technical knowledge and other circumstances that existed at the time of manufacture, not at the time of loss or injury." Fla. Stat. § 768.1257. The parties dispute whether this defense applies to all design defect claims—that is, both negligent design claims and strict liability claims—or whether it solely applies to strict liability claims.

However, in this case, we do not need to determine whether the state-of-the-art defense applies to strict liability claims only, or to both strict liability and negligent design claims. We will assume arguendo—but expressly do not decide—that it applies with equal force to both kinds of claims.

Having so assumed, we conclude that, while it may have been error for the district court not to issue FEG's requested state-of-the-art instruction, it was not reversible error. This is because the only issues relevant to the instruction were undisputed. The instruction requires the jury to "consider the state of the art of scientific and technical knowledge . . . that existed at the time of manufacture, not at the time of loss or injury." Fla. Stat. § 768.1257 (emphasis added). Neither the relevant time period (the time of manufacture, which was 2010) nor the state of the art at that time were disputed by the parties.

25

First, the parties did not dispute that the relevant time period was the date of manufacture—that is, 2010—and not the date of the accident (2015), or the date of trial (2018). Crawford did not base his alternative design argument on technology that was not available or in use in 2010; it is clear that self-deploying guards were in existence in 2010. It was clear throughout the trial that the relevant time was when the Hobart 6614 was manufactured in 2010. As Crawford notes, both parties' closing arguments stated that the jury needed to consider the technology available in 2010. D.E. 74 at 21-24, 26, 42.[7]

Second, the parties did not dispute the state of the art available at the time in 2010.[8] It is clear that there was automatic blade guard technology as of 2010 (and, indeed, well before 2010). Professor Barnett so testified. His affidavit, supplementing his report, revealed at least three meat saws using automatic blade

---

[7] We are not persuaded by FEG's repeated quotation of Professor Barnett purportedly conceding that "nothing" about his design was around in 2010. At trial, FEG's lawyer asked Professor Barnett: "[j]ust so we're clear, nothing that you talked to us today about your design was around when this saw was manufactured in 2010 or designed in the late 1990s, correct?" Professor Barnett answered: "I think that's correct." D.E. 71 at 134. Given the questions that immediately followed, it is apparent to us that Professor Barnett understood the question as "was your specific design in use in the 1990s or 2010?" On redirect examination, Crawford's lawyer asked Professor Barnett "was all of the technology, all of the equipment, all of the hardware involved in your modification available in 2010," "in 1990," and "decades before?" Professor Barnett answered yes to all three questions. D.E. 71 at 135. We thus do not think that Barnett's testimony can fairly be read as conceding that nothing about his design was around when the Hobart 6614 was designed or manufactured.

[8] We doubt that FEG preserved its objection to the failure to give the instruction except to the extent of its argument that the jury should be instructed that the relevant time to evaluate FEG's conduct was the 2010 manufacture date. See supra n.6. However, as noted below, there is no reversible error, plain or otherwise.

26

guards as of the date of manufacture in 2010, and Professor Barnett discussed them in his trial testimony, as well as his experience that the technology had long been available in the industry, as far back as 1917. In 2007, there was even a recommendation from OSHA that the meat industry install self-deploying blade guards. D.E. 71 at 84. FEG never disputed this fact. Rather, it argued only that the meat saws using the automatic blade guard technology were all small, and that the technology had not been applied to meat saws capable of cutting the volume of meat necessary in a large meat department, so the technology could not be feasibly applied in that context. The plain language of Florida's state-of-the-art statute directs the finder of fact to consider the state of the art of "scientific and technical <u>knowledge</u>" at the time of manufacture. Whether or not such technical <u>knowledge</u> had actually been applied on a meat saw with adequate capacity, and whether or not such application was feasible, are clearly issues of fact, quintessentially jury questions.

Moreover, the jury was instructed on the proper substantive standard for negligence. The district court's instruction provided: "Negligence is the failure to use reasonable care, which is the care that a reasonably careful designer and manufacturer would use <u>under like circumstances</u>. Negligence is doing something that a reasonably careful designer and manufacturer would not do <u>under like circumstances</u> or failing to do something that a reasonably careful designer and

27

manufacturer would do <u>under like circumstances</u>."  D.E. 84 at 8 (emphasis added); <u>see also</u> Florida Standard Jury Instruction (Civil) 403.9.  "Like circumstances," to an ordinary English speaker, would include temporal circumstances.  We thus think that the instructions given to the jury sufficiently encompassed the thrust of the state-of-the-art instruction that they did not receive.

For these reasons, there is no basis to think that the outcome of the trial would have been any different had the district court given the requested state-of-the-art instruction.  We will therefore affirm as to this issue.

## V.    INTRODUCTION OF OSHA REPORTS

Finally, FEG argues that the district court improperly admitted summaries of OSHA reports of fatalities and catastrophes—plaintiffs' Exhibit 7, a compilation of eight summaries of incident reports of injuries involving meat saws—on two grounds: hearsay and relevance.  The district court's decision to admit evidence is reviewed for abuse of discretion.  <u>Hines v. Brandon Steel Decks, Inc.</u>, 886 F.2d 299, 302 (11th Cir. 1989).

### A. <u>Hearsay</u>

The district court acknowledged that the OSHA reports were hearsay, but concluded that they fell under the Federal Rules of Evidence public records exception, which provides in relevant part:

> Rule 803. Exceptions to the Rule Against Hearsay—Regardless of Whether the Declarant Is Available as a Witness

28

> The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness: . . .
>
>> (8) Public Records. A record or statement of a public office if: (A) it sets out: . . . (iii) in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and (B) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

Fed. R. Evid. 803(8).  To evaluate trustworthiness, courts are to look at a non-exhaustive list of four factors: the timeliness of the investigation, the investigator's skill/experience, whether a hearing was held, and possible bias.  Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 167 n.11 (1988) (paraphrasing the Advisory Committee's note).  The plain language of Rule 803(8)(B), as well as established case law, provides that the burden of demonstrating a lack of trustworthiness is on the party opposing admission.  See Kehm v. Procter & Gamble Mfg. Co., 724 F.2d 613, 618 (8th Cir. 1983) ("The burden is on the party opposing admission to prove the report's untrustworthiness.")

FEG argues that the OSHA reports fail the Beech Aircraft test because they lack sufficient indicia of trustworthiness.  FEG makes several arguments: that the reports do not reveal the investigators' identity, skill, or experience; that they do not note whether a hearing was held in the matter; and that two of the

29

investigations described in the reports were conducted several months after the incidents. FEG also asserts that the reports are "perfunctory." [9]

FEG also argues that the reports contain multiple levels of hearsay. If a statement contains multiple levels of hearsay, each level must satisfy an exception to the hearsay rule. United Techs. Corp. v. Mazer, 556 F.3d 1260, 1280 (11th Cir. 2009) (citing Fed. R. Evid. 805). While the district court stated that only the parts of the reports that fall under the exceptions to the hearsay rule will be admitted, one of the reports read into the record contained double hearsay. [10]

Crawford argues that the OSHA reports fall squarely within the government records hearsay exception. They are "factual findings from a legally authorized investigation." Rule 803(8)(A)(iii). They are written after OSHA investigations that follow established procedures. Crawford contends that these reports meet

---

[9]     FEG also notes that the investigators who wrote the reports were not available to testify and be cross-examined in the district court. FEG is correct that there is precedent from this Court indicating that the inability to cross-examine the investigators is relevant to Rule 803(8)'s trustworthiness analysis. See Hines, 886 F.2d at 303 ("While the inability to cross-examine the investigator cannot per se invalidate the report . . . it is nonetheless a proper factor to take into consideration when deciding trustworthiness."). We emphasize that Hines expressly notes that the inability to cross-examine cannot, by itself, invalidate the report. As we note below, this, and the absence of a hearing, are the sole factors FEG can muster, aside from mere speculation. Moreover, we note that all of the Rule 803 exceptions apply notwithstanding the lack of availability of the declarant. And we see nothing special about this situation; for example, other witnesses at the various companies involved would be available to throw further light on the incidents described in the summaries, had FEG desired to present such evidence.

[10]     One of the reports included the statement "According to the manager, who did not see the accident happen, the employee slipped, and his finger contacted the blade while the saw was running." D.E. 73 at 60 (quoting Plaintiffs' Exhibit 7).

30

three of the <u>Beech Aircraft</u> factors: while there was admittedly no hearing before the reports were prepared, they were all opened less than six months after each incident, and five of the eight were opened within three weeks; they were not prepared in anticipation of litigation; and OSHA requires an "appropriately trained and experienced compliance officer" to oversee the investigations.

We agree with Crawford that the OSHA reports were properly admitted under the public records exception to the general bar on hearsay.[11]  The reports are not "mere collection[s] of statements from a witness," but are "factual findings that are based upon the knowledge or observations of the preparer of the report." <u>Mazer</u>, 556 F.3d at 1278 (internal citations and quotations omitted).  Indeed, the OSHA reports fall squarely within the public records exception for "factual findings from a legally authorized investigation," Rule 803(8)(A)(iii), a fact not disputed by FEG.  Rather, FEG argues only that they should have been excluded as untrustworthy.  But FEG has failed to carry its burden of proof that the reports are untrustworthy.  There is no evidence of untrustworthiness suggested by the reports themselves.  They are timely: only two of the reports were delayed as much as six months after the incidents in question and five of the eight investigations began within three weeks.  There is no evidence that the investigators who drafted the

---

[11]    We thus do not reach Crawford's alternative argument that they were properly introduced under Federal Rule of Evidence 703 because Professor Barnett relied on them in forming his expert opinion.

31

reports were unskilled or inexperienced.  And there is no evidence of possible bias. The only Beech Aircraft factor that the reports do not meet is that they were not prepared with the aid of a hearing.

In short, FEG has adduced no evidence that the OSHA reports lack trustworthiness.  All FEG has done is hypothesize that the investigators might have been biased, unskilled, or inexperienced (notwithstanding OSHA's published assurances that its investigators shall be "appropriately trained or experienced," and notwithstanding the common sense notion that a public official would act with particular care when investigating a fatality or catastrophe).  We are unwilling to conclude that mere anonymity—in the absence of any evidence of lack of trustworthiness—is sufficient for a court to infer that OSHA investigators were biased, unskilled, or inexperienced.  This is especially true because the burden of proving lack of trustworthiness is on FEG.

FEG's reliance upon mere speculation that the investigators might have been unskilled, inexperienced, or biased is at war with the purpose and justification for the public records exception.  As the Advisory Committee noted: "justification for the [public records] exception is the assumption that a public official will perform his duty properly and the unlikelihood that he will remember details independently of the record."  Drawing upon the Advisory Committee notes and numerous authorities, the concurring opinion of Judge Tjoflat in Rainey v. Beech Aircraft

32

Corp., 827 F.2d 1498 (11th Cir. 1987),[12] expresses well this policy underlying Rule

803(8):

> Broad admissibility of public records containing evaluative
> conclusions (i.e., normative judgments drawn from the analysis of
> facts) is good policy because these reports are presumptively reliable.
> Rule 803(8)(C) is premised on "the assumption that a public official
> will perform his duty properly and the unlikelihood that he will
> remember details independently of the record." Fed. R. Evid. 803
> advisory committee's note. Admission of public records can be
> justified by the probability that the officials conducting the
> investigation (who themselves are under a public duty) will be careful
> and discriminating in selecting the factual data upon which to rely in
> reaching their findings and conclusions. Most investigators under a
> public duty lack a motive to distort the facts or their conclusions.

827 F.2d at 1512-13 (internal citations and quotations omitted).

Of course, this presumption of regularity accorded to public records by Rule

803(8) is rebuttable. But FEG, as the party opposing admission, has the burden of

proving a lack of trustworthiness. FEG's problem in this appeal is that it has failed

to carry its burden. FEG has adduced no evidence at all—apart from bald

speculation—that any of the OSHA reports lack trustworthiness. Under these

circumstances, we cannot conclude that the district court abused its broad

discretion in admitting the OSHA reports.

As noted above, FEG also argues that the OSHA reports should have been

excluded because they contained double hearsay. In denying without prejudice

---

[12]    This court's opinion in Rainey was reversed by the Supreme Court in an opinion entirely consistent with Judge Tjoflat's concurrence.

FEG's motion in limine, the district court expressly ruled that only those portions of the reports would be admitted that are not double hearsay. See D.E. 56 at 11. However, at trial, FEG never specifically pointed to any portion of any reports that constituted double hearsay. In its motion for new trial, FEG pointed for the first time to one of the two sentences of alleged double hearsay to which it points on appeal. And even on appeal, FEG points to only two sentences, only one of which is clearly double hearsay. Even if one or two sentences of double hearsay crept into evidence, we cannot conclude that there would be reversible error, and certainly not plain error. Even if one or two of the reports were excluded, the other six or seven make the same point with comparable force. Moreover, Professor Barnett's testimony presented to the jury forceful evidence that a machine like the 6614 saw, which lacked an automatically deploying blade guard and thus was vulnerable to the inevitable mistakes inherent in human nature, posed a grave danger as a matter of common sense and common experience. Indeed, the OSHA reports were merely timely illustrations of the danger that was a major focus of Barnett's testimony. The Professor testified that "[i]t . . . has always been known in the industry. Since 1917, it has been known . . . . I just happened to pick the OSHA data . . . because it . . . fit into the right time frame." D.E. 71 at 97-98.

34

For the foregoing reasons, we cannot conclude that the district court committed reversible error in admitting the OSHA reports and rejecting FEG's hearsay objection.

B. Relevance

FEG also argues that the circumstances underlying the accidents described in the OSHA reports are not sufficiently similar to Crawford's injury to be relevant.

This Court has concluded that prior similar incidents illustrating a potential design defect are admissible if (1) the proponent makes a showing that the prior accidents are substantially similar, (2) the prior accidents are not too remote in time, and (3) the probative value of the evidence outweighs any potential prejudice or confusion. Sorrels v. NCL (Bahamas) Ltd., 796 F.3d 1275, 1287 (11th Cir. 2015); Borden, Inc. v. Fla. E. Coast Ry. Co., 772 F.2d 750, 755 (11th Cir. 1985). "We have held that evidence of similar accidents might be relevant to the defendant's notice, magnitude of the danger involved, the defendant's ability to correct a known defect, the lack of safety for intended uses, the strength of a product, the standard of care, and causation." Jones v. Otis Elevator Co., 861 F.2d 655, 661 (11th Cir. 1988) (internal quotations omitted).

FEG contends that the prior incidents are not substantially similar because none of them involved a scenario in which an employee was injured after leaving

35

the saw on, walking away from the machine and then returning to it, and reaching over the saw. In one of the OSHA reports, the employee turned off the saw but did not lower the guard; in another, an employee gestured to another butcher; in another, the operator's hand was wet and slipped while lowering the guard; and in another, the operator left the saw running and adjusted the guard higher than necessary.

FEG also contends that the probative value of the reports was outweighed by potential prejudice. Crawford's attorneys asked FEG's expert Bader about almost all of the OSHA reports, in addition to asking how many more similar incidents occurred that were not reported to OSHA. Crawford's opening and closing statements mentioned the OSHA reports and inferred "many other[] [injuries] that have not been reported."

Crawford argues that the OSHA reports were relevant to show that FEG had not exercised reasonable care in choosing to use a manually adjustable guard. They demonstrate that manually adjustable blade guards have caused injuries in the past. The reports meet the "substantially similar" standard because each describes an incident where the same or a similar adjustable guard injured a person when that person was not cutting meat.

Crawford also argues that the admission of the reports did not have any significant unfair prejudicial impact. The district court limited the admission of the

36

reports during Professor Barnett's testimony.  The reports were raised again when Crawford cross-examined FEG's expert Bader, but defense counsel did not object or point to any unfair prejudice so that the experienced trial judge could have exercised his discretion to limit the cross-examination.

We conclude that the district court's admission of the OSHA reports was not an abuse of its broad discretion.  The reports were clearly relevant.  They illustrated the common-sense danger of an unguarded saw blade that was a major focus of the testimony of Crawford's expert, Professor Barnett, as well as the foreseeability that human error and an unguarded saw blade would inevitably combine to cause injury, as both of Crawford's experts testified.  The reports were also relevant on the issue of whether FEG had notice of the danger,[13] and to impeach FEG's longtime employee and expert witness Bader, who testified that the Hobart 6614 saw was reasonably safe and that Crawford's injury was not reasonably foreseeable.

FEG does not (and could not) seriously argue that the OSHA reports are not relevant.  Rather, the focus of its argument is that the reports are not substantially similar to the instant accident.  For several reasons, we readily conclude that the

---

[13]    FEG's employee Bader testified that he had not been aware prior to this lawsuit of the prior incidents involving Hobart saws, and that he did not know of the OSHA website's reporting of fatalities and catastrophes.  However, six of the eight OSHA reports indicated that they involved Hobart saws.

district court did not abuse its discretion in ruling that the OSHA reports were substantially similar. Every report involved either the same blade guard used on the Hobart 6614 saw, or one substantially similar in that it had to be moved into place manually by the operator. Every report involved careless operator error resulting from distraction or other lack of focus or inattentiveness—all manifestations of the inevitable human error about which Crawford's human factors expert testified, as well as Professor Barnett. Thus, the OSHA reports were substantially similar in the manner most relevant in this case—i.e., the serious danger that exists, and the foreseeable serious injury (e.g., amputation of fingers, hands, or arms) that occurs when inevitable human error combines with an unguarded saw blade. In almost all of the reports, it is probable that an automatically deployed blade guard would have protected the operator from his or her own human mistake and avoided injury. The reports were also timely. Six of the eight occurred in or before the 2010 date of manufacture of the Hobart 6614 model.

FEG also argues that the prejudice and confusion outweighs the probative value of the OSHA reports. We cannot conclude that the district court abused its broad discretion in this regard. As noted above, the probative value was considerable. The reports were clearly relevant to indicate the magnitude of the danger posed by an unguarded saw blade, especially when combined with the

38

inevitable human error apparent in the incidents reported by OSHA.  Moreover, the

reports were highly probative in impeaching Bader's testimony that such injuries

were not reasonably foreseeable.  FEG points to no evidence of jury confusion.

Although FEG complains now about Crawford's counsel's cross-examination of

Bader using the reports, counsel interposed no contemporaneous objection, and

thus failed to invoke the discretion of the district judge to limit any unfair

prejudice.  In a similar Rule 403 context, this court in Borden distinguished

between unfair prejudice and relevant evidence that is "simply adverse to the

opposing party":

> [W]e conclude that the probative value of the evidence of the [prior]
> August 31, 1978 incident would not have been outweighed by the
> possibility of unfair prejudice to FEC.  The trial judge is accorded
> broad discretion in determining whether evidence should be excluded
> under Rule 403 and we will only reverse when there has been a clear
> abuse of discretion.  Without question, admission of the evidence
> would have been adverse to FEC, but unfair prejudice as used in Rule
> 403 cannot be equated with evidence that is simply adverse to the
> opposing party.  We do not see how any prejudice to FEC resulting
> from the admission of evidence of the August 31, 1978 incident would
> have been "unfair."  FEC argues that since it does not know the
> identities of the vandals in the August 31, 1978 incident, the evidence
> would be unduly prejudicial because it would be unable to distinguish
> the two incidents.  We find this contention untenable because we fail
> to see how FEC's lack of knowledge concerning the perpetrator's
> identities has any impact on its ability to foresee that the switching
> and signalling systems could be vandalized in this particular manner.

772 F.2d at 756 (internal citations and quotations omitted).  We cannot conclude

that the district court here abused its broad discretion in rejecting FEG's argument

that unfair prejudice outweighed the considerable probative value of the OSHA reports.[14]

For all of the foregoing reasons, we cannot conclude that the district court abused its broad discretion in admitting the OSHA reports.

## VI.    CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court in all respects.

**AFFIRMED.**

---

[14]    FEG also complains about not knowing the identity of the investigators of each OSHA report.  However, as in <u>Borden</u>, with respect to the issue of relevance, it is hard to see what potential impact the investigator might have had on the probative value of these reports—i.e., their illustration of the foreseeability that the combination of human error and an unguarded saw blade poses a significant risk of serious injury.

TJOFLAT, Circuit Judge, dissenting:

I respectfully dissent from the majority opinion, except for parts II.A and V, because it errs in two significant ways. First, it applies the wrong legal standard to determine whether portions of Professor Barnett's trial testimony should have been excluded under Federal Rule of Civil Procedure 37(c)(1). Second, it errs in holding that the District Court's failure to instruct the jury on the state-of-the-art defense was harmless error. The District Court's failure to instruct the jury entitles FEG to a new trial.

## I.

Rule 26(a) requires parties to produce a written report from each expert witness containing "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). "A party must make these disclosures at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). Rule 26(e) requires supplementation of expert reports after initial disclosures when "the party learns that in some material respect the disclosure or response is incomplete or incorrect." Fed. R. Civ. P. 26(e)(1)(A).

"If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was

substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). As I explained in dissent in *Taylor v. Mentor Worldwide LLC*, 940 F.3d 582, 607–08 (11th Cir. 2019), a nondisclosure is substantially justified or harmless under Rule 37(c)(1) only if: (1) the nondisclosure was a mistake, and (2) the undisclosed information was already known to the opposing party. I continue to adhere to this standard because it best comports with the purpose of the Rules and their advisory committee notes. *See Taylor*, 940 F.3d at 608 n.4, 613–15 (Tjoflat, J. dissenting).

The drafters of the Rules intended to give parties "a reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from [their own] witnesses" by requiring disclosure of testimony "sufficiently in advance of trial." Fed. R. Civ. P. 26(a)(2) advisory committee's note to 1993 amendment. To enforce this critical function, the drafters provided the "self-executing" "automatic sanction" of exclusion in Rule 37(c). The automatic sanction is intended to provide "a strong inducement for disclosure of material that the disclosing party would expect to use as evidence, whether at trial, at a hearing, or on a motion." Fed. R. Civ. P. 37(c)(1) advisory committee's note to 1993 amendment. The general aim of this regime is to "make a trial less a game of blindman's buff and more a fair contest with the basic issues and facts disclosed to the fullest practical extent." *Thibeault v. Square D Co.*, 960 F.2d 239, 244 (1st Cir.

1992) (quoting *United States v. Procter & Gamble Co.*, 356 U.S. 677, 682, 78 S.

Ct. 983, 986–87 (1958)).

However, the drafters also recognized that the strong medicine of automatic

exclusion can be "unduly harsh" in certain situations. Fed. R. Civ. P. 37 advisory

committee's note to 1993 amendment. They therefore exempted violations that are

substantially justified or harmless. The advisory committee notes to Rule 37 give

the following examples where the sanction is inappropriate:

> [T]he *inadvertent* omission from a Rule 26(a)(1)(A) disclosure of the name of a potential witness *known* to all parties; the failure to list as a trial witness a person so *listed by another party*; or the lack of knowledge of a pro se litigant of the requirement to make disclosures. In the latter situation, however, exclusion would be proper if the requirement for disclosure had been called to the litigant's attention by either the court or another party.

*Id.* (emphasis added). These examples give edges to an otherwise amorphous

standard. In each of these examples except the latter—which applies a more

lenient standard to *pro se* litigants—two things are true: The violation was

accidental, and the undisclosed information was already known to the opposing

party. *See Sommer v. Davis*, 317 F.3d 686, 692 (6th Cir. 2003) (the advisory

committee's note "strongly suggests that 'harmlessness' involves an honest

mistake on the part of a party coupled with sufficient knowledge on the part of the

other party"); *see also Gagnon v. Teledyne Princeton, Inc.*, 437 F.3d 188, 197 (1st

43

Cir. 2006) (noting that the examples in the advisory committee note "suggest a fairly limited concept of 'harmless'").

Under this standard, the District Court was required to exclude Professor Ralph Barnett's testimony about other patents and saws unless the Rule 26 violation was accidental and FEG already knew of the patents and saws. Neither requirement is met here. Plaintiffs' Rule 26 violation, therefore, was neither harmless nor substantially justified, and the District Court erred by admitting the testimony.

## A.

The District Court initially set the deadline for expert disclosures as September 1, 2017, and the parties agreed to extend it to September 15, 2017. On September 15, the parties exchanged expert reports. Barnett's expert report expressed the opinion that FEG negligently designed the Hobart 6614 because it did not implement a concept that, while feasible, was not used on any commercial meat saws at the time of the Hobart's manufacture. On December 1, 2017, FEG filed a *Daubert* motion and a motion for summary judgment addressing the weaknesses of this specific expert opinion.[1] In their response, Plaintiffs attached

---

[1] FEG's memorandum in support of its summary judgment motion repeatedly attacks Plaintiffs' failure to introduce any alternative design in existence at the time of the Hobart's manufacture. *See* Defs.' Mot. Summ. J. at 2, ECF No. 19 ("One of Plaintiffs' experts merely theorizes that an automatic guard could be developed for the meat saw because he has a concept for such a guard . . . This type of conceptual, *ipse dixit* expert testimony is insufficient to satisfy

44

an affidavit from Barnett supporting a completely new and improved theory of liability.[2]  Barnett's affidavit, dated December 12, 2017, listed two patents and three meat saws with automatic blade guards that, according to Barnett, "would have prevented Mr. Crawford's injury" "[w]ithin a reasonable degree of engineering certainty."  Thus, Plaintiffs' theory was no longer that FEG was

---

the requirements of *Daubert*."); *id.* at 8 ("In fact, Mr. Barnett concedes that no alternative design existed at the time the meat saw left ITW FEG's control in 2010 that would have prevented Mr. Crawford's accident."); *id.* at 11 ("Neither Mr. Barnett nor Mr. Edwards can identify a single, alternative design available at the time of manufacture that would have prevented Mr. Crawford's accident."); *id.* at 12 ("Neither Mr. Barnett nor Mr. Edwards can identify a single manufacturer utilizing Mr. Barnett's proposed design and, indeed, admit that no manufacturer uses his design."); *id.* at 14 (". . .  Mr. Barnett readily admitted that his proposed auto-deploying guard was not on the market when the subject meat saw was manufactured in 2010. Given that the auto-deploying guard was not available, no reasonable butcher could have expected the subject meat saw to be equipped with such non-existent technology." (citation omitted)); *id.* at 15 ("Nor have Plaintiffs proffered a single alternative design available at the time of the meat saw's manufacture in 2010.  Plaintiffs' only proposed alternative design was conceptualized in 2015." (citation omitted)); *id.* at 16 ("Simply saying that there is an even safer product that could have been developed is insufficient as a matter of law to prove a design defect.").

[2] Barnett's affidavit cannot be considered a permissible supplementation under Rule 26(e).  Rule 26(e) requires supplementation of expert reports after initial disclosures when "the party learns that in some material respect the disclosure or response is incomplete or incorrect." Fed. R. Civ. P. 26(e)(1)(A).  Thus, it allows supplementation only when a party learns of an omission or error in the report that makes it misleading.  *See, e.g.*, *Goodbys Creek, LLC v. Arch Ins. Co.*, No. 3:07-cv-947, 2009 WL 1139575, at *2 (M.D. Fla. Apr. 27, 2009) ("Rule 26(e) allows supplementation of expert reports only where a disclosing party learns that its information is incorrect or incomplete . . . . [A] report that suffers from a major omission cannot be cured by the use of supplementation.") (internal quotation marks omitted); *Cochran v. The Brinkmann Corp.*, No. 1:08-cv-1790, 2009 WL 4823858, at *5 (N.D. Ga. Dec. 9, 2009) (Rule 26(e) "is not a device to allow a party's expert to engage in additional work, or to annul opinions or offer new ones to perfect a litigating strategy"), *aff'd*, 381 F. App'x 968 (11th Cir. 2010).  This is also evident from the provision's mandatory language.  Its effect is to *require* supplementation when it is necessary to avoid a misleading report, not to *permit* supplementation when it would benefit the supplementing party at summary judgment or trial.  In this way, the provision operates principally to the benefit of the non-supplementing party.  Thus, Barnett's affidavit, which mended a weakness in his original report and changed the theory of Plaintiffs' case, was not a permissible supplementation under Rule 26(e).

45

negligent in failing to be an industry trailblazer.  Instead, it was that the Hobart

6614 was "outdated," and that FEG was lagging behind its competitors, for whom

automatic blade guards were "the state of the art."[3]

Plaintiffs' memorandum in response to FEG's motion for summary

judgment ran with this new theory and asserted that the existence of the competitor

saws raised factual disputes that precluded summary judgment.[4]  In doing so,

---

[3] Plaintiffs' memorandum in response to FEG's motion for summary judgment stated: "For Defendant's competitors, the state of the art is that the default condition is a guarded blade when the user steps away from the saw."

[4] Plaintiffs' repeated emphasis of the competitor saws in their memorandum shows that Barnett's affidavit was far from a minor supplementation.  *See* Pls. Resp. to Defs.' Mot. Summ. J. at 2, ECF No. 25 ("Other meat band saw companies use a guard that automatically covers the blade when the user steps away from the saw. There is a genuine issue of material fact about whether Defendant failed to use reasonable care in choosing to design a guard that would not automatically cover the blade."); *id.* at 7 ("In order to grant summary judgment, the court would have to wade into this factual dispute and rule as a matter of law that the existing auto-deploying guards (such as the Bizerba style guard, or a guard operated by a foot-pedal) are so impractical that no reasonable juror could agree with Plaintiff."); *id.* at 10 ("Reasonable jurors could find that the design of the subject saw was dangerously outdated because the Bizerba style improved guard had been public knowledge for 24 years at the time that Hobart began designing the Model 6614 that injured Plaintiff Crawford. The Bizerba style improved guard has already been used on the Bizerba FK 23 saw, the MADO saw, and the OmegaOne saw. . . . Since the Bizerba style guard is several years older than the Hobart 6614 guard, a reasonable juror could find that the Hobart 6614 guard has never been state of the art, and has always been outdated and not up to the consumer expectations set by the 1976 Bizerba style auto-deploying guard."); *id.* ("Reasonable jurors could also find that the Hobart saw was defective for not using a foot-pedal controlled guard, since Hobart was already using foot-pedals on at least three models of its mixer/grinders, and such a guard is feasible and now in use on the Thompson brand meat saw."); *id.* at 12 ("Defendant manufacturer chose not to use a reasonable alternative design in the form of the 20+ year old Bizerba style improved guard that defaults to a guarded position. Any dispute by Defendant about the reasonableness of the Bizerba style improved guard is a question of fact that should be resolved by the jury. A reasonable jury could find that a band saw guard that does not require a user to remember to lower the guard after using the saw (i.e. the Bizerba guard) is a reasonable alternative design, and that Defendant ITW's decision to ignore that design makes the product defective."); *id.* at 13 ("A reasonable jury could find that Defendant should have made changes to the design after the history of other similar incidents, the existence of the Bizerba hinge style guard since 1976, and the fact that Thompson Meat Machines patented an auto-

Plaintiffs completely reframed the summary judgment issue and injected factual

disputes that FEG had no opportunity to meet.  The discovery cut-off date, October

2, 2017, had long passed, and FEG had no chance to depose Barnett on the matter

of the competitor saws or to solicit expert opinions about the feasibility of adapting

the competitor designs to the Hobart 6614.  Accordingly, FEG moved to exclude

Barnett's affidavit and any related testimony.  The District Court held an

evidentiary hearing to consider FEG's motion, along with its summary judgment

and *Daubert* motions.

In this situation, the district judge should have asked two simple questions:

First, was Plaintiffs' failure to include the competitor saws and patents in Barnett's

original expert report a mere mistake?  Second, did FEG already know of the

competitor saws and patents?  If the answer to either question was no, then Rule

37(c)(1)'s "automatic sanction" of exclusion was necessary to prevent unfairness

to FEG.  The analysis is straightforward.  First, Plaintiffs' untimely disclosure of

Barnett's affidavit was not a mistake.  Barnett stated in his deposition that he had

searched the patent literature in vain for meat saws with self-deploying blade

guards.  It was not until after Barnett's expert report and deposition that his

---

deploying guard in 2011."); *id.* at 15 ("Defendant's argument is also flawed because the jury would not necessarily have to rely on Professor Barnett's modified saw as an example of how an auto-deploying guard could have been used on the Model 6614. The auto-deploying guards on the previously discussed saws from companies like Bizerba, MADO, Omega One, and Thompson Meat Machines easily support a finding of causation.").

47

"continued . . . efforts to review guard designs" bore fruit.  Thus, Barnett's

untimely affidavit was simply a case of too little, too late.  Second, there is no

indication that FEG already knew of the patents and saws mentioned in Barnett's

affidavit.  On the contrary, FEG stated in response to interrogatories that it was not

aware of any such designs.  Plaintiffs' Rule 26 violation, therefore, was neither

harmless nor substantially justified, and the District Court was required to exclude

the evidence.

Instead of doing what Rule 37 required, the District Court decided Plaintiffs'

Rule 26 violation was either "harmless or substantially justified," and issued an

order denying FEG's motion.  In doing so, the District Court erred by applying the

wrong legal standard and shifting the burden of proof onto FEG.  The District

Court's finding of harmlessness was based entirely on defense counsel's

statements at the evidentiary hearing that Barnett's affidavit "really doesn't say,

quite frankly, all that much" and that it "doesn't change the . . . analysis."  But

these statements are irrelevant to the Rule 37 inquiry—the only questions were

whether Plaintiffs' violation was a mistake and whether FEG already knew the

undisclosed information.[5]  Furthermore, the burden is on the rule-breaking party to

_____

[5] Even assuming the probative value of the undisclosed information is relevant to the Rule 37 inquiry, defense counsel's statements could not fairly be construed to bear on the affidavit's substance.  Most of defense counsel's discussion of the affidavit pertained to its admissibility, not to its probative value if admitted at trial.  And, even assuming defense counsel spoke to substance, it was in FEG's interest for the purpose of its summary judgment motion to

48

show harmlessness. *See Knight through Kerr v. Miami-Dade County*, 856 F.3d 795, 812 (11th Cir. 2017) (noting that plaintiffs had "not carried their burden" under Rule 37(c)(1) of showing substantial justification); *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1107 (9th Cir. 2001) ("Implicit in Rule 37(c)(1) is that the burden is on the party facing sanctions to prove harmlessness."). FEG's counsel could not diminish or eliminate Plaintiffs' burden by making a few statements at an evidentiary hearing.

After trial, in its order denying FEG's renewed motion for judgment as a matter of law, the District Court doubled down on its Rule 26 ruling. The District Court reasoned that the Rule 26 violation was harmless or substantially justified because FEG "had the opportunity to cross-examine the Crawfords' witnesses, presented testimony from its experts about the feasibility of these alternative meat saw designs, and provided testimony on [FEG]'s competitors." But the District Court missed the point. FEG was harmed because it was denied the benefit of discovery concerning the saws and patents identified in Barnett's affidavit. The opportunity for discovery on these matters is precisely what Rule 26 is intended to

---

minimize the impact of the affidavit. The District Court, therefore, put FEG in a serious dilemma: either argue in support if its motion for summary judgment and lose the exclusion issue, or argue in support of exclusion to the detriment of its summary judgment motion. If this seems odd, it is because defense counsel's statements had no legitimate bearing on the harm analysis.

secure, and its denial is not rendered harmless by the mere ability to cross-examine and present witnesses at trial.

In sum, the District Court erred by applying the wrong standard to the Rule 37 harm inquiry, shifting the burden of proof to FEG, and admitting evidence it was required to exclude.

B.

Today, the majority repeats the District Court's mistake and applies a permissive harm standard that tolerates the precise unfairness that Rule 26 was meant to preclude.

Under the majority's approach, a court assessing harm under Rule 37 should look to whether the party seeking exclusion was "prejudiced by surprise or impairment of ability to prepare." Applying this standard, the majority reasons that the District Court was within its discretion to excuse Plaintiffs' Rule 26 violation because Barnett's affidavit "was submitted five months before trial" and "automatic blade guard technology had long been known in the industry." There are at least three problems with this approach.

First, as already explained, the majority's approach frustrates the purpose of Rule 26 by tolerating conduct that the Rule squarely precludes. In doing so, the majority neutralizes Rule 37(c)(1)'s "strong inducement" and leaves Rule 26's

50

disclosure requirements grossly underenforced. Apart from promoting the values of fairness and full disclosure, Rule 26 also promotes order and efficiency. The majority suggests that FEG could have asked for a supplemental deposition, but it fails to appreciate how disruptive this would be. By the time Plaintiffs' revealed Barnett's new opinion, discovery had closed, FEG had filed its summary judgment and *Daubert* motions, and Plaintiffs had responded. Taking a second deposition would effectively mean reopening discovery and starting again from square one on the parties' motions. FEG would have to procure new expert opinions to meet Barnett's evolved opinion. FEG's expert would have to familiarize himself with the competitor saws and patents on which Barnett relied, develop an opinion as to whether the blade guards on those saws and patents could be feasibly adapted to the Hobart 6614, and prepare an expert report or supplementation addressed to those issues. In essence, FEG would have to construct a new defense to meet Plaintiffs' new theory. This would entail shifting back the trial date along with the rest of the District Court's scheduling order. Rule 26 is intended not only to facilitate full and fair disclosure, but to facilitate disclosure *at the right time*. The majority's suggestion that Rule 26 is satisfied as long as discovery can be done again ignores this point.

Second, the majority gives itself powers that Rule 26 vests with the District Court. Rule 26 gives the District Court authority to determine disclosure

51

deadlines. Rule 26(a)(2)(D) ("A party must make these disclosures at the times and in the sequences that the court orders."). But, in noting that Barnett's affidavit was submitted five months before trial—enough time, according to the majority, for FEG to "ask[] the district court for a supplemental deposition"—the majority effectively displaces the District Court's authority. Under the majority's approach, a court of appeals can effectively disregard the deadline set by the district court if it believes that the movant had sufficient time to prepare to meet the untimely information before trial. This is simply not what the Rule contemplates.

Third, the majority fails to appreciate the impact of Barnett's affidavit on Plaintiffs' negligent design claim. The majority reasons that Barnett's late affidavit—listing meat saws and patents in existence at the time of the Hobart's manufacture—was harmless because Barnett's initial expert report showed that the meat saw industry knew that automatic blade guard technology existed. This reasoning assumes that the difference between a *feasible* alternative design and an *actual* alternative design is largely immaterial. On the contrary, the difference is important under any potential theory of negligence.[6]

---

[6] The parties disagree about which standard applies to negligent design cases under Florida law. FEG argues that a plaintiff must prove negligent design under either the risk-utility or consumer-expectations tests. Plaintiffs insist that negligent design can be proven under general negligence principles of foreseeability and reasonable care. For the sake of this discussion, I will assume that all theories are applicable.

Under the consumer-expectations theory, the question is whether the product "failed to perform as safely as an ordinary consumer would expect when used as intended or in a reasonably foreseeable manner." *Aubin v. Union Carbide Corp.*, 177 So.3d 489, 503 (Fla. 2015). Industry standards—i.e., the products actually produced by manufacturers—directly inform consumers' reasonable expectations. *Id.* (noting that the consumer expectations test "intrinsically recognizes that a manufacturer plays a central role in establishing the consumers' expectations for a particular product"). Alternative designs that are merely feasible, by contrast, have little or no bearing on consumers' reasonable expectations.

The distinction is also important under the risk-utility test. Under that test, courts are to consider as separate factors the "availability of other, safer products to meet the same need" and "the ability to eliminate or minimize the danger without seriously impairing the product or making it unduly expensive."[7] *Radiation Tech., Inc. v. Ware Constr. Co.*, 445 So.2d 329, 331 (Fla. 1983). The focus of the former factor is the existence of safer alternative designs *on the market*. The focus of the latter is the technological and economic *feasibility* of safer alternative designs.

---

[7] The full factors are: (1) likelihood/gravity of potential injury balanced against its utility, (2) availability of other safe products to meet the same need, (3) obviousness of the danger, (4) public knowledge/expectation of the danger, (5) adequacy of instructions and warnings, and (6) the ability to eliminate/minimize the danger without impairing the product or making it too expensive. *Radiation Tech.*, 445 So.2d at 331.

53

Finally, the difference is important under a general negligence approach that looks to whether the defendant acted as a reasonably careful designer or manufacturer under the circumstances. Industry standards are strong evidence of what constitutes reasonable care. *Seaboard Coast Line R. Co. v. Clark*, 491 So. 2d 1196, 1198 (Fla. Dist. Ct. App. 1986). If many products in the industry use a safety mechanism that a defendant's product does not, that is more probative of negligence than a purely conceptual safety mechanism.

Evidence that the Hobart 6614 could have been designed with an automatic blade guard, therefore, is different from evidence that Hobart's competitors were using such a design. That Barnett's initial expert report included the former does absolutely nothing to reduce the harm caused by the untimely disclosure of the latter.

In sum, the District Court erred by applying the wrong harm standard and admitting expert evidence that did not comply with Rule 26. Rather than correcting the District Court's mistakes, the majority repeats them. The majority insists that its holding is "a narrow one" that "adds little to the meaning or scope of the term 'harmless.'" On the contrary, today's opinion contributes to the erosion of Rule 26 and provides further assurance to litigants that they can get away with strategic violations. *See Taylor*, 940 F.3d at 613–16 (Tjoflat, J. dissenting).

C.

54

FEG raised its Rule 26 argument in the context of its renewed motion for judgment as a matter of law. Accordingly, the District Court's failure to exclude Barnett's testimony about competitor saws and patents is only reversible if a reasonable jury could not find that FEG was negligent on the basis of the remaining evidence at trial. *See London v. Fieldale Farms Corp.*, 410 F.3d 1295, 1301 (11th Cir. 2005).

As the majority notes, the applicable standard for negligent design under Florida law is unclear. FEG argues that two paths exist: the consumer-expectations test and the risk-utility test. The consumer-expectations test "considers whether a product is unreasonably dangerous in design because it failed to perform as safely as an ordinary consumer would expect when used as intended or in a reasonably foreseeable manner." *Aubin*, 177 So.3d at 503. Meanwhile, the risk-utility test balances six factors to determine whether a product's risk outweighs its utility to the consumer. The six factors are: (1) likelihood/gravity of potential injury balanced against its utility, (2) availability of other safe products to meet the same need, (3) obviousness of the danger, (4) public knowledge/expectation of the danger, (5) adequacy of instructions and warnings, and (6) the ability to eliminate/minimize the danger without impairing the product or making it too expensive. *Radiation Tech.*, 445 So.2d at 331. The risk-utility test, unlike the

55

consumer-expectations test, "requires plaintiffs to establish a reasonable alternative of how a product could have been designed." *Aubin*, 177 So.3d at 494–95.

Plaintiffs claim that neither the risk-utility test nor the consumer-expectations test applies to negligent design cases. Instead, Plaintiffs insist that the applicable standard looks to "whether the defendant's design creates a generalized and foreseeable risk of harming others."

Although no case directly addresses what standard applies in negligent design cases, the Florida Supreme Court's decision in *Aubin* sheds light on the issue. In *Aubin*, the Florida Supreme Court held that the consumer-expectations test applies in strict products liability cases, rejecting the argument that the risk-utility test is the exclusive standard. *Aubin*, 177 So.3d at 510–11. In so holding, the Court noted that the purpose of strict products liability is to make it easier for consumers to recover than it is in negligence cases. *Id.* at 511. According to the Court, the risk-utility test would frustrate this purpose because it poses a higher burden than what is required in negligence cases, not a lower one. The consumer-expectations test, the Court observed, is easier for plaintiffs to satisfy than the risk-utility test because the latter requires the plaintiff to prove a reasonable alternative design. *Id.* at 505–06. Accordingly, the Court held that, although the risk-utility test is one way to prove strict products liability, it is not the exclusive way. *Id.*

56

The *Aubin* court's discussion allows for two important inferences. First, if the consumer-expectations test were applicable in negligent design cases, then it would not be easier for a plaintiff to recover in strict products liability than in negligence. Therefore, the consumer-expectations test must not be applicable in negligent design cases. Second, while the risk-utility test may be one way to prove negligent design, it is not the only way.[8] This is evident from the *Aubin* court's statement that the risk-utility test poses a higher burden than what is applicable in negligence cases. There must be another, less burdensome standard by which a plaintiff can prove negligent design.

*Ford Motor Co. v. Evancho*, 327 So.2d 201 (Fla. 1976), provides guidance on what this less burdensome standard might be. *Evancho* addressed the liability of automobile manufacturers for defective design in second collision cases.[9] The negligence standard articulated by the Court was: "The manufacturer must use

---

[8] *Radiation Technology* seems to endorse the risk-utility test at least as one possible way a plaintiff can prove negligent design. In that case, the Florida Supreme Court addressed the certified question of whether a product can be inherently dangerous if it only poses a danger of property damage and not bodily injury. *Radiation Tech.*, 445 So.2d at 331. The Court answered in the affirmative, and noted that the legal relevance of the "inherently dangerous" concept is that it is merely a factor to be considered in the analysis of the "liability of a manufacturer or supplier," and proceeded to list the risk-utility factors. *Id.*

[9] Second collision cases are a category of cases concerning the liability of automobile manufacturers for defective designs that enhance or cause injury in the event of a collision, but that do not cause the collision itself. *Evancho*, 327 So.2d at 202.

reasonable care in design and manufacture of its product to eliminate unreasonable

risk of foreseeable injury." *Id.* at 204.

The Florida Standard Jury Instruction for negligent design also supports the

standard suggested by *Evancho*. It provides:

> Negligence is the failure to use reasonable care, which is the care that
> a reasonably careful [designer] would use under like circumstances.
> Negligence is doing something that a reasonably careful [designer]
> would not do under like circumstances or failing to do something that
> a reasonably careful [designer] would do under like circumstances.

Fla. Std. Jury Instr. (Civ.) 403.9.

This Court's decision in *Jennings v. BIC Corp.*, 181 F.3d 1250 (11th Cir.

1999), also analyzed a negligent design claim under Florida law using general

negligence principles rather than the risk-utility or consumer-expectations tests. In

*Jennings*, we addressed a manufacturer's liability in strict liability and negligence

for injuries caused by the manufacturer's failure to child-proof disposable lighters.

We first rejected the plaintiffs' strict liability claim because we found that the

lighter was put to an unintended use—as a children's plaything. *Id.* at 1256. We

then turned to the negligent design claim and noted that "Florida courts impose

different standards in assessing liability under negligence and strict products

liability." *Id.* We stated that the threshold inquiry for a negligent design claim is

whether the defendant owed a duty of care to the plaintiff. *Id.* at 1257. Florida

law, we observed, "imposes a broad duty of care" that exists "whenever a human

58

endeavor creates a generalized and foreseeable risk of harming others." *Id.*

(quoting *McCain v. Florida Power Corp.*, 593 So.2d 500, 503 (Fla. 1992)).  After

concluding that the manufacturer owed a duty of care to the plaintiffs, we

addressed whether the manufacturer breached the duty of care.  *Id.*  In doing so, we

did not invoke the risk-utility test or the consumer-expectations test.  Instead, we

simply asked whether the manufacturer acted reasonably in relying on warning

labels in lieu of child-safety mechanisms.[10]  *Id.*  We determined that the

manufacturer could reasonably expect that its lighters would only be purchased by

adults, and that those adults would heed the package's warning to keep the lighters

away from children.  *Id.* at 1257–58.

All of this strongly suggests that negligent design under Florida law may be

proven by reference to general negligence principles.  In other words, a plaintiff

need not wedge his case into the risk-utility mold.  Therefore, the question in this

case is whether, excluding Barnett's testimony about other saws and patents, the

evidence was legally sufficient for a jury to conclude that Plaintiffs were injured

---

[10] FEG argues that *Jennings* actually did apply the risk-utility test, albeit implicitly, to determine whether the manufacturer breached its duty of care.  According to FEG, this is clear because the Court talked about the adequacy of the instructions and the reasonability of additional safety measures.  These considerations, however, are common to both the risk-utility analysis and an analysis based on general notions of reasonable care.  If the Court had applied the risk-utility test, it would have also addressed the other factors under that test.

because FEG failed to act as a reasonably careful designer under the circumstances.

At trial, the jury heard evidence of the foreseeable dangers posed by the Hobart 6614 and saws like it.  Specifically, Plaintiffs produced a video of the incident at issue in this case and OSHA reports about injuries sustained by operators of precursor saws to the Hobart 6614.  Plaintiffs' other expert, Dr. Mark Edwards, also testified about the human tendency to become distracted and make mistakes in busy work environments—a phenomenon which he claimed contributed to Plaintiffs' injury.

The jury also heard Barnett testify about his proposed alternative design. While the blade guard on the Hobart 6614 had to be manually deployed, the blade guard on Barnett's saw was self-deploying.  This means that an operator of Barnett's saw could walk away from the machine while it was running and a mechanism would automatically cover the blade to prevent injury.  Barnett claimed that if the Hobart 6614 had used his design, Plaintiffs' injury would not have occurred.  Edwards echoed this opinion.  Barnett also stated that nothing about the state of the art at the time the Hobart 6614 was manufactured would have prevented FEG from using a self-deploying blade guard.

On the other hand, FEG produced testimony that could cause doubt about whether FEG could have used a design like Barnett's on the Hobart 6614 without

60

compromising its function and creating other dangers. Specifically, FEG's expert Jack Hyde testified that Barnett's proposed alternative design would be difficult to clean and would create a risk of passing bacteria into the meat that it cuts. Furthermore, Brian Bader, an engineer for FEG, testified that Barnett's design would create "operational issues," such as tripping over the foot switch that controls the self-deploying blade guard.

Finally, the jury heard testimony about the measures FEG took to prevent injury from the Hobart 6614. Specifically, Bader testified that a warning label on the Hobart 6614 directed operators to "[k]eep hands clear" and "[d]o not operate without covers and guards in place."

A reasonable jury could conclude, based on the above evidence, that FEG was negligent because it failed to design the Hobart 6614 with a self-deploying blade guard, and that this failure caused a foreseeable injury to Plaintiffs. FEG's countervailing evidence—calling Barnett's design into question and showing that FEG warned about the possibility of injury—was not so overwhelming as to preclude a negligence finding as a matter of law.[11] Accordingly, although the

---

[11] FEG argues that our decision in *Jennings* shows that FEG acted reasonably as a matter of law by relying on the warnings it placed on the Hobart 6614 in lieu of a self-deploying blade guard. However, Plaintiffs introduced evidence that the warning labels on the Hobart 6614 were particularly inadequate to prevent the type of harm the Hobart 6614 posed. Indeed, the chief purpose of Dr. Edwards' testimony was to show that mere knowledge of a risk is an insufficient prophylaxis for a dangerous machine that is often operated under distracting conditions. The warning labels on the lighter packages in *Jennings*, by contrast, were directed toward parents,

61

District Court erred in admitting Barnett's testimony about competitor meat saws and patents, this error does not amount to a ground for reversal.

## II.

The District Court erred in declining to instruct the jury on the state-of-the-art defense. This error entitles FEG to a new trial.[12]

"The District Court abuses its discretion by failing to give a requested instruction only when '(1) the requested instruction correctly stated the law, (2) the instruction dealt with an issue properly before the jury, and (3) the failure to give the instruction resulted in prejudicial harm to the requesting party.'" *Mamani v. Sanchez Bustamante*, 968 F.3d 1216, 1245 (11th Cir. 2020) (quoting *Burchfield v. CSX Transp., Inc.*, 636 F.3d 1330, 1333–34 (11th Cir. 2011)). There is no dispute that FEG's requested instruction correctly stated the law. Rather, the parties disagree about whether Florida's state-of-the-art defense applies to a claim for negligent design, and whether FEG was prejudiced by the District Court's failure

---

and there was no evidence suggesting it was unreasonable to believe that parents would not heed the warnings.

[12] Contrary to Plaintiffs' arguments, FEG properly preserved its objection to the District Court's failure to instruct. FEG submitted a proposed instruction on the state-of-the-art defense and subsequently objected when the district judge declined to read it to the jury. Contrary to footnote 8 in the majority opinion, FEG's objection was not limited to the portion of the instruction that directs the jury to focus on the time of manufacture. Rather, FEG objected to the District Court's refusal to read the instruction in its entirety. Thus, the argument is wholly preserved.

to instruct.  Florida's state-of-the-art defense is best interpreted to apply to claims for negligent design, and the District Court's failure to instruct the jury on the defense was not harmless.  Therefore, FEG is entitled to a new trial.

A.

The general purpose of the state-of-the-art concept "is to protect a manufacturer from liability for failure to anticipate safety features that were unknown or unavailable at the time a product was manufactured and distributed." Am. Jur. 2d *Products Liability* § 1199 (2020).  In some states, the concept acts as an affirmative defense to a products liability action, such that a defendant who proves that his product conforms to the state of the art will be immune from liability.  *See, e.g.*, A.R.S. § 12-683; Neb. Rev. St. § 25-21, 182.  Other states' statutes merely provide that evidence of state of the art is admissible and may—or sometimes, must—be considered in assessing the manufacturer's liability.  *See, e.g.*, A.C.A. § 16-116-204; T.C.A. § 29-28-105.  Under this approach, evidence that a manufacturer complied with the then-existing state of the art is not an automatic bar to recovery.  Nor does it result in an automatic finding of negligence if a manufacturer did not comply with the state of the art.  Gary C. Robb, *A Practical Approach to Use of State of the Art Evidence in Strict Products Liability Cases*, 77 Nw. U. L. Rev. 1, 6–14 (1982).

63

The Third Restatement of Torts notes that the term "state of the art" is subject to multiple definitions. Restatement (Third) of Torts § 2 cmt. d (Am. Law Inst. 1998). Conforming to the state of the art may mean "that the product design conforms to industry custom, that it reflects the safest and most advanced technology developed and in commercial use, or that it reflects technology at the cutting edge of scientific knowledge." *Id.* Although industry custom is often relevant to state of the art, the two concepts are distinct. "[I]n products liability actions, 'custom in the industry' refers to what is being done in the industry, and 'state of the art' refers to what feasibly could have been done." Am. Jur. 2d *Products Liability* § 1199 (2020). Thus, the state-of-the-art defense does not "insulate an entire industry from liability just because every member of that industry was manufacturing and distributing a product known to be inherently dangerous." *Id.*

Florida's state-of-the-art defense statute provides:

> In an action based upon defective design, brought against the manufacturer of a product, the finder of fact *shall* consider the state of the art of scientific and technical knowledge and other circumstances that existed at the time of manufacture, not at the time of loss or injury.

Fla. Stat. § 768.1257 (emphasis added).

Put simply, § 768.1257 does two things: (1) It requires the factfinder to consider the state of the art and other circumstances at the time of manufacture; and (2) it prohibits the factfinder from considering the state of the art and other

64

circumstances at any other time.  The provision does not operate as an affirmative defense, but as an evidentiary imperative.  *See* 1999 Fla. Sess. Law Serv. Ch. 99-225 (H.B. 775) (noting that § 768.1257 "requir[es] the finder of fact, in certain product defect actions, to consider circumstances that existed at the time of manufacture").

Section 768.1257 is not limited to state-of-the-art evidence in a strict sense. The provision directs the factfinder to consider not only "the state of the art of scientific and technical knowledge," but also "other circumstances."  Presumably, "other circumstances" includes evidence related to the state of the art without being state of the art evidence in a strict sense–i.e., industry custom.  *See* Restatement (Third) of Torts § 2 cmt. d; *see also* Am. Jur. 2d *Products Liability* § 1199 (discussing the relationship between state of the art and industry custom).

## B.

Plaintiffs argue that the District Court properly refused to instruct the jury on § 768.1257 because it only applies to strict liability claims.  Appellee's Br. 37–42. In support of this argument, Plaintiffs note that § 768.1257 by its terms applies to "an action based upon defective design," but does not mention negligent design.

65

*Id.* at 38.  According to Plaintiffs, the phrase "defective design" includes only strict liability claims, not negligent design claims.  *Id.* at 38–39.  Plaintiffs note that the phrase "defective design" frequently appears throughout the Florida Standard Jury Instructions together with the phrase "strict liability."  *Id.* (citing Fla. Std. Jury Instr. (Civ.) 403.7b).  Meanwhile, the negligence instruction speaks in terms of "reasonable care" in the design.  *Id.* at 39 (citing Fla Std. Jury Instr. (Civ.) 403.9).

Plaintiffs' argument is unpersuasive.  Under Florida law, defective design may be proven under either a negligence or strict liability theory.  *Jennings*, 181 F.3d at 1255–58; *see also Ford Motor Co. v. Hill*, 404 So.2d 1049, 1051–52 (Fla. 1981).  Nothing in the language of § 768.1257 limits its scope to one theory or the other.  Plaintiffs' inferences from the standard jury instructions are also incorrect. The notes to the negligence instruction make it clear that the failure to use reasonable care in designing a product amounts to a design defect.  *See* Fla. St. Jury Instr. (Civ.) 403.9 n.1 (speaking in terms of product *defect*).

Furthermore, Plaintiffs have failed to identify a case or statute from any jurisdiction saying that the state-of-the-art defense is appropriate in strict liability but not in negligence.[13]  This is not surprising.  As this Court observed in *Norton v.*

---

[13] Plaintiffs' cite *McGuire v. Davidson Mfg. Corp.*, 398 F.3d 1005, 1010 (8th Cir. 2005), in support of their argument that § 768.1257 does not apply in negligence because the provision does not expressly say negligence.  However, *McGuire* did not deal with a product defect claim at all.  Before the court was "a theory of general negligence, Iowa's version of res ipsa loquitor."  *Id.* at 1007.  The court held that Iowa's state-of-the-art defense statute did not apply to general

*Snapper Power Equipment, Division of Fuqua Industries, Inc.*, 806 F.2d 1545, 1549 (11th Cir. 1987), the applicability of the state-of-the-art defense in negligence is widely accepted. It is in strict liability that the defense is uncertain.[14] *Norton*, 806 F.2d at 1549. Plaintiffs have offered no convincing argument that § 768.1257 flipped things around.[15]

In sum, § 768.1257 is best interpreted to apply in negligent design cases. Because FEG's requested instruction dealt with an issue that was properly before

---

negligence claims because the statute, by its express terms, only applied in product defect cases. *Id.* at 1010. Plaintiffs' also cite *Bohack v. Keller Indus., Inc.*, 895 So.2d 1113, 1114 (Fla. Dist. Ct. App. 2005), but *Bohack* simply did not address the applicability of § 768.1257 to a claim for negligent design. **.**

[14] Indeed, some courts have held that state-of-the-art evidence is inadmissible in strict liability because it relates to issues only relevant in negligence. *See, e.g.*, *Flatt v. Johns Manville Sales Corp.*, 488 F. Supp. 836, 841 (E.D. Tex. 1980) ("Evidence relating to the state of the art at the time of manufacture is relevant only to the issue of due care in the manufacturing process, a negligence concept not at issue in this strict liability action."); *Elmore v. Owens-Illinois, Inc.*, 673 S.W.2d 434, 438 (Mo. 1984) ("[T]he law in Missouri holds that state of the art evidence has no bearing on the outcome of a strict liability claim; the sole subject of inquiry is the defective condition of the product and not the manufacturer's knowledge, negligence or fault."); *Cryts v. Ford Motor Co.*, 571 S.W.2d 683, 689 (Mo. App. 1978) ("Ford argues that it built the safest armrest possible under the technology existing in 1957. Such a contention has no bearing on the outcome of a strict liability claim, where the sole subject of inquiry is the defective condition of the product and not the manufacturer's knowledge, negligence or fault."); *Beshada v. Johns-Manville Products Corp.*, 90 N.J. 191, 196 (1982) (holding that state-of-the-art evidence is inadmissible in strict liability failure to warn cases) *see also Olson v. A. W. Chesterton Co.*, 256 N.W.2d 530, 540 (N.D. 1977) (stating that state-of-the-art evidence is less probative in strict liability actions than in negligence ones).

[15] Puzzlingly, Plaintiffs argue that it makes sense that § 768.1257 would only apply in strict liability because "[c]onsiderations of what a reasonable manufacturer should do in a particular circumstance are not at issue in strict liability, making it imperative that the jury be instructed to consider the defense." Appellee's Br. at 42. But the irrelevancy of reasonableness in strict liability is precisely why some courts have held that state-of-the-art evidence is only admissible in negligence cases. *See* note 14, *supra*.

67

the jury, the failure to deliver the instruction was reversible error unless it was harmless.

C.

A district court's failure to properly instruct the jury is only reversible when the failure resulted in prejudicial harm to the requesting party. *Mamani*, 968 F.3d at 1245. Prejudicial harm occurs when the jury instructions as a whole leave us "with a substantial, ineradicable doubt as to whether the jury was properly guided in its deliberations in this regard." *Id.* (quoting *United States v. Dohan*, 508 F.3d 989, 993 (11th Cir. 2007) (quotation marks omitted).

The majority concludes that even if the District Court erred in declining to instruct the jury on the state-of-the-art defense, the error was harmless. According to the majority, the instruction would have made no difference because the parties agreed on both the relevant time period and the state of the art at that time. The only thing the parties disputed, says the majority, was whether automatic blade guard technology could be feasibly adapted to the Hobart 6614. Furthermore, to the extent there was any harm from the failure to instruct, the majority asserts it was cured by the negligence instruction given the jury. I respectfully disagree.

As I explained above, § 768.1257 requires the jury to consider the scientific and technical knowledge and "other circumstances" existing at the time of

68

manufacture and prohibits the jury from considering the same at any time other than the time of manufacture. Thus, the failure to instruct was prejudicial if there is "substantial, ineradicable doubt" that the jury was properly informed of its duty to consider certain evidence and disregard other evidence. Such doubt exists here because the jury was never told of this evidentiary imperative, and there is a substantial risk that it both considered evidence that it was prohibited from considering and disregarded evidence that it was bound to consider.

First, because of the District Court's failure to instruct, there is a substantial risk that the jury considered evidence that § 768.1257 prohibited it from considering. The Hobart 6614 was manufactured in 2010, but the jury heard testimony about technology existing at the time of the lawsuit—i.e., Barnett's alternative design. The evidence at trial was ambiguous as to whether this design was feasible in 2010. Barnett testified that "nothing" about his design was around in 2010. FEG takes this statement as a concession that Barnett's design was not technologically feasible in 2010. Another possible interpretation is the one the majority takes: that Barnett meant only that his specific design was not in use in 2010. The jury could have taken the former interpretation. If it did, then § 768.1257 required the jury to disregard Barnett's alternative design. Without an instruction to this effect, the jury could have based its liability finding on

69

technology existing at the time of the lawsuit but, as the jury may have found, not existing at the time of manufacture.

Second, the state-of-the-art instruction was necessary to ensure that the jury considered evidence it was required to consider. Section 768.1257 requires the jury to consider evidence of "other circumstances" existing at the time of manufacture. As I have explained, "other circumstances" is best interpreted to include evidence of industry custom. FEG elicited testimony on cross-examination that the standard in the commercial meat saw industry was to use manual, not automatic blade guards.[16] The jury may or may not have been persuaded that this was, in fact, the industry standard. To the extent that it was, § 768.1257 required it to consider this evidence in determining liability. Therefore, an instruction was required to ensure the jury would not disregard evidence it was bound to consider.

The majority believes that any harm FEG may have suffered from the failure to instruct was cured by the negligence instruction. However, the effect of that instruction is fundamentally different from the state-of-the-art instruction. The negligence instruction provides:

> Negligence is the failure to use reasonable care, which is the care that a reasonably careful designer and manufacturer would use under like circumstances. Negligence is doing something that a reasonably

---

[16] On cross-examination, Crawford testified that he had been cutting meat for 40 years and had never seen or used a meat saw with an automatic blade guard. Additionally, as already mentioned, Barnett testified that that "nothing" about his design was around in 2010.

70

careful designer and manufacturer would not do under like circumstances or failing to do something that a reasonably careful designer and manufacturer would do under like circumstances.

This instruction merely informs the jury that, in assessing whether the defendant used reasonable care, it is required to consider the circumstances. Unlike § 768.1257, it does not tell the jury that the circumstances it must consider are those at the time of manufacture. Nor does it tell the jury that it must not consider the state of the art and circumstances at any time other than manufacture. The negligence instruction therefore could not cure the prejudice caused by the failure to instruct on the state-of-the-art defense.

\*                    \*                    \*

For the foregoing reasons, the District Court's failure to instruct the jury on the state-of-the-art defense was reversible error, and FEG is entitled to a new trial. I respectfully dissent